1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

SMSW ENTERPRISES, LLC ET AL.

Plaintiffs,

v.

HALBERD CORPORATION ET AL.,

Defendants.

Case No. CV 13-01412 BRO (SPx)

**AMENDED FINDINGS OF FACT AND CONCUSIONS OF LAW AFTER COURT TRIAL**

## I.     <u>INTRODUCTION</u>

This case involves a fraud perpetrated by George Trevor Porrata with both sides claiming to be the victim.  The dispute surrounds the agreement to transfer shares of stock in Halberd Corporation ("Halberd") for $400 in cash and forgiveness of approximately $500,000 in debt in connection with another company, Wavelet. After Halberd consistently failed to participate in the litigation despite multiple opportunities to do so, the Court granted summary judgment in the Plaintiffs' favor on two counts, securities fraud and interference with prospective economic advantage.  Yet the Court was unable to determine the amount of damages as a matter of law because, as Plaintiffs concede, Halberd stock is "volatile and thinly traded."  As a result, the Court conducted a bench trial as to damages on those claims.  The following explains the Court's findings of fact and conclusions of law. As detailed below, judgment is for Plaintiffs as to the breach of contract, securities fraud, and interference with prospective economic advantage claims.  The Court does not address Plaintiffs' claim for declaratory relief, again finding it duplicative of the Court's findings of fact and conclusions of law.

## II.     <u>BACKGROUND AND PROCEDURAL HISTORY</u>

This case has a tortured procedural history.  The following table lists the events leading up to this trial limited to certain causes of action and damages:

| February 26, 2013 | Complaint filed.  (Dkt. No. 1.) |
| March 1, 2013 | Halberd served, starting a time period of twenty-one days to respond (March 22, 2013). |
| March 5, 2013 | ITC served, starting a time period of twenty-one days to respond (March 26, 2013). |
| March 29, 2013 | Plaintiffs' Request for Clerk to Enter Default against ITC, (Dkt. No. 21), and Halberd, (Dkt. No. 22), filed. |
| April 3, 2013 | Halberd's Answer filed.  (Dkt. No. 26.) |

| April 5, 2013 | Clerk's Default entered against ITC, (Dkt. No. 29), and Halberd, (Dkt. No. 30). |
|---|---|
| April 23, 2013 | Halberd's Motion to Set Aside Entry of Default filed.  (Dkt. No. 41.) |
| May 8, 2013 | ITC's Motion to Set Aside Entry of Default filed.  (Dkt. No. 55.) |
| June 21, 2013 | Order granting Motion to Set Aside Entry of Default.  (Dkt. No. 73.) |
| July 19, 2013 | Plaintiff's Motion to Disqualify Counsel Wolk & Levine, LLP filed.  (Dkt. Nos. 79, 80.) |
| July 22, 2013 | Plaintiff's Motion for Summary Judgment filed.  (Dkt. No. 82.) |
| July 29, 2013 | Plaintiff's Notice of Withdrawal of Motion to Disqualify Counsel filed.  (Dkt. No. 89.) |
| July 31, 2013 | Order granting Defendants' Ex Parte Application to Withdraw as Attorney.  (Dkt. No. 92.) |
| July 30, 2013 | Defendants' Ex Parte Application to Dismiss Plaintiffs' Motion for Summary Judgment or *alternatively* Ex Parte Application to Continue Hearing on Motion for Summary Judgment.  (Dkt. No. 91.) |
| August 1, 2013 | Order denying Defendants' Ex Parte Application to Dismiss Motion for Summary Judgment but granting Defendants' request to move the hearing.  (Dkt. No. 94.) |
| September 9, 2013 | Order for Halberd and ITC to obtain counsel.  (Dkt. No. 103.) |
| September 20, 2013 | Order to Show Cause issued to Defendants why the Motion for Summary Judgment should not be granted.  (Dkt. No. 104.) |
| September 24, 2013 | Order striking the Answers of Halberd Corporation and ITC Corporation.  (Dkt. No. 105.) |
| October 1, 2013 | Default entered by the Clerk against |

3

| | |
|---|---|
| | ITC, (Dkt. No. 109), and Halberd, (Dkt. No. 110). |
| October 3, 2013 | Motion for Default Judgment filed against Halberd and ITC.  (Dkt. No. 115.) |
| October 4, 2013 | Notice of Deficiency re: Mr. Liguori and Mr. Lowing.  (Dkt. No. 118.) |
| October 9, 2013 | Plaintiff's Motion for Summary Judgment filed against Mr. Liguori and Mr. Lowing.  (Dkt. No. 120.) |
| November 22, 2013 | Order granting Plaintiff's Motions for Default Judgment against Halberd and ITC and Summary Judgment against Mr. Liguori and Mr. Lowing.  (Dkt. No. 128.) |
| December 3, 2013 | Judgment entered against Defendants.  (Dkt. No. 130.) |
| December 20, 2013 | Plaintiff's Ex Parte Application for Order to Show Cause as to Why Defendant ITC and aider and abettor Randall Goulding should not be held in contempt.  (Dkt. No. 132.) |
| January 2, 2014 | Defendant's Motion to Set Aside Default and Summary Judgments. (Dkt. No. 138.) |
| February 7, 2014 | Order granting Defendants' Motion to Set Aside Default and Summary Judgment.  (Dkt. No. 183.) |

Thereafter, on February 24, 2014, all Defendants, Halberd, Interstate Transfer Corporation ("ITC"), Liguori, and Lowing answered the Complaint.  (Dkt. No. 186.) On March 27, 2014, Plaintiffs filed a motion for summary judgment.  (Dkt. No. 189.) Defendants opposed the motion for summary judgment on April 16, 2014.  (Dkt. No. 203.)  On April 22, 2014, Plaintiffs replied. (Dkt. No. 209.)

On May 30, 2014, the Court granted in part and denied in part Plaintiffs' motion for summary judgment.  (Dkt. No. 217.)  The Court's summary judgment order found Defendants liable for securities fraud.  (Dkt. No. 217 at 14–17.)  The

4

Court also found Defendants Liguori and Lowing liable for tortious interference with prospective economic advantage. (Dkt. No. 217 at 18–19.) In granting summary judgment, however, the Court found that it could not determine damages as a matter of law. With respect to the breach of contract claim (based upon a third-party-beneficiary theory) and the declaratory relief claim, the Court denied summary judgment. Specifically, the Court found the declaratory relief claim to be superfluous. (Dkt. No. 217 at 18.)

On October 22, 2014, a bench trial in this matter commenced as to the damages for Plaintiffs' securities fraud and interference with economic advantage claims. (Dkt. No. 288.) The trial concluded on October 23, 2014. (Dkt. No. 289.) After consideration of the parties' trial briefs, the evidence presented at trial, oral argument of counsel, and proposed findings of fact and conclusions of law, the Court makes the following Findings of Fact and Conclusions of Law.[1]

## III.   **JURISDICTION AND VENUE**

This Court has subject matter jurisdiction over this case pursuant to sections 20(d)(1) and 22(a) of the Securities Act of 1933, 15 U.S.C. §§ 77t(d)(1), 77v(a), and pursuant to sections 21(d)(3)(A), 21(e) and 27 of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78u(d)(3)(A), 78u(e), 78aa. The Court has personal jurisdiction over all of the Defendants and relief Defendants under section 27 of the Exchange Act, 15 U.S.C. § 78aa. Venue is proper in the Central District of California pursuant to section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and section 27 of the Exchange Act, 15 U.S.C. § 78aa.

## IV.   **CREDIBILITY DETERMINATIONS**

Ninth Circuit Model Jury Instruction 1.11 provides guidance to jurors when assessing credibility. The factors include: (1) the opportunity and ability of the witness to see or hear or know the things testified to; (2) the witness's memory;

---

[1] Any finding of fact which constitutes a conclusion of law is hereby adopted as a conclusion of law.

FINDINGS OF FACT AND CONCLUSIONS OF LAW AFTER COURT TRIAL

(3) the witness's manner while testifying; (4) the witness's interest in the outcome of the case and any bias or prejudice; (5) whether other evidence contradicted the witness's testimony; (6) the reasonableness of the witness's testimony in light of all the evidence; and (7) any other factors that bear on believability.  Ninth Cir. Model Jury Instr. (Civil) 1.11 (2007).  The Court finds these factors helpful in assessing the credibility of the witnesses who testified in this matter.

## V.    FINDINGS OF FACT

"In bench trials, [Federal Rule of Civil Procedure] 52(a) requires a court to 'find the facts specially and state separately its conclusions of law thereon.'" *Vance v. Am. Haw. Cruises, Inc.*, 789 F.2d 790, 792 (9th Cir. 1986).  "One purpose behind Rule 52(a) is to aid the appellate court's understanding of the basis of the trial court's decision.  This purpose is achieved if the district court's findings are sufficient to indicate the factual basis for its ultimate conclusions." *Id.* (citations omitted).  Furthermore, the court "is not required to base its findings on each and every fact presented at trial." *Id.  See generally Kurth v. Hartford Life & Accident Ins. Co.*, 845 F. Supp. 2d 1087, 1091 (C.D. Cal. 2012).  Consequently, the Court's findings of fact are detailed below.

1.    Halberd is a publicly held corporation, organized under the laws of the State of Nevada, whose stock trades on the over-the-counter ("OTC") Market Pink Sheets.

2.    In 2009, when Halberd was formed, John C. Maddox became an original director with Mark Lundquist.  The Securities and Exchange Commission ("SEC") approved Halberd's public offering in April 2009.  Halberd's Certificate of Incorporation authorizes under 130 million shares of stock.  (*See* Ex. 50.)[2]  The number of authorized shares was not amended until April 18, 2014, to increase the number of shares to 600 million, with 590 million shares of common stock with a par value of .001 and 10 million shares of preferred stock with a par value of .001.

---

[2] The Certificate of Incorporation is a publicly filed document.

3.     ITC is a business entity owned by Janis Patterson.  Ms. Patterson also serves as the president of ITC.  Ms. Patterson has been in the transfer agency business for approximately thirty years.  ITC is a registered transfer agent as required by the SEC.  ITC serves as the exclusive transfer agent for Halberd common stock and has done so since December 2011.  Trial Exhibit 18, the December 7, 2011 Stock Transfer Agreement, details ITC's agreement with Halberd.  Specifically, Trial Exhibit 18 represents that, as of December 7, 2011, there were 128,249,454 issued and outstanding shares of Halberd common stock.  Trial Exhibit 18 authorizes ITC to issue or transfer all the common stock of Halberd.

4.     Henry Liguori was a Catholic priest from 1966 to 1996.  Mr. Liguori knew that his nephew, Mr. Porrata, appointed him (Liguori) to be the figurehead Chief Executive Officer of Halberd.  Mr. Liguori served as Halberd's Chief Executive Officer until approximately December 2012.

5.     Rueben Lowing is an individual who served as the president of Halberd until approximately May 2013.

6.     Martin Katz serves as the sole or principal owner of SMSW Enterprises, 23710 Enterprises, 5086 Enterprises, and 966 Third Avenue Enterprises (collectively, "Plaintiff LLCs").  Mr. Katz also manages the Plaintiff LLCs.

7.     Mr. Katz also is employed as an accountant for Wilco Financial Services Corporation and serves as its registered agent for service of process.

8.     Mr. Katz has a background in finance and accounting as summarized in his resume, Trial Exhibit 78.

9.     Plaintiff 27310 Enterprises has, in the past, shared an address with Wilco Financial Services at 27310 Lund Street, Woodland Hills, California.

10.     The Plaintiff LLCs, Mr. Katz, Charlotte Wilshinsky, and Wilco Financial Services Corp. have all been simultaneous owners of an entity named Transnational Group, Inc.

11.     Mr. Katz and Charlotte Wilshinsky have simultaneously been officers of Transnational Group, Inc.

12.     Mr. Wilshinsky advises the Plaintiff LLCs as well as the investors in the Plaintiff LLCs.  The investors consist of Mr. Wilshinsky's family members.

13.     After October 2010, Mr. Maddox sold his shares in Halberd to Mr. Liguori.  Mr. Liguori's nephew, Mr. Porrata, negotiated with Mr. Maddox.  The agreement to sell control in Halberd to Mr. Liguori was consummated in January 2011.  Calco, LLC owned 18 million shares of Halberd stock and agreed to sell those shares to Mr. Liguori.  In consideration for the sale, Halberd received $12,500 as a down payment and a note of $175,000.[3]  Mr. Liguori never became a controlling shareholder of Halberd, however, because he did not fulfill his obligations under the agreement.  As a result, the Halberd shares were later returned to Mr. Maddox.[4]

14.     On or about June 7, 2011 and August 18, 2011, Mr. Katz and William Bragg drafted stock purchase agreements, marked as Trial Exhibits 1 through 4.  The Plaintiff LLCs and Halberd entered into separate Stock Purchase Agreements (the "Purchase Agreements") in writing with each Plaintiff LLC, whereby Halberd agreed to sell to each Plaintiff LLC 2.7 million shares of Halberd's common stock.  (*See* Exs. 1–4 ¶ 1.)

15.     Trial Exhibits 1 through 4 require the transfer of 2,700,000 shares of restricted stock in exchange for the four separate $100 payments.

16.     The Purchase Agreements included a clause claiming that it represented the "full and entire understanding and agreement of the parties."  (Exs. 1–4 ¶ 6.3.)

---

[3] Halberd received three payments of $3000 on the 2011 $175,000 note owed by Mr. Liguori.  Mr. Liguori admits that he never paid Halberd $200,000 for any shares of stock.  Mr. Liguori also maintains that he never received certificates for the shares of Halberd stock.

[4] In 2012, the $175,000 convertible note became due, payable in stock or cash.  Halberd did not exercise any conversion rights because Mr. Porrata promised to begin paying on the note.

17.     The Purchase Agreements also included a representation as to the investment experience and sophistication of the Plaintiff LLCs.  (Exs. 1–4 ¶¶ 4.4, 4.5.)

18.     All four Purchase Agreements (Trial Exhibits 1 through 4) and the September 14, 2012 letter from Halberd to ITC (Trial Exhibit 32) appear to have the signature of Henry Liguori.  Yet Mr. Liguori claims that the signature is not genuine.

19.     Mr. Wilshinsky's family members held a previous investment in a publicly traded company called Wavelet.  Pursuant to the Purchase Agreements, in exchange for $500,000 in debt forgiveness, Mr. Wilshinsky's family members[5] would receive shares in Halberd.  Mr. Porrata offered 13.3 million shares of free trading stock to Mr. Wilshinsky and his family members.  The Plaintiff LLCs were formed to receive the Halberd stock, of which they were to receive 10.8 million restricted shares of common stock.

20.     Mr. Katz paid $400 in cash to Mr. Wilshinsky for the shares of stock because Mr. Wilshinsky enjoyed a direct relationship with Mr. Porrata.  Mr. Katz has also worked with Mr. Wilshinsky for over twenty years.  Mr. Katz performs personal accounting for Mr. Wilshinsky.  Mr. Wilshinsky's mother owns an interest in one of the Plaintiff LLCs.  Because of their relationship, Mr. Katz did not obtain a receipt from Mr. Wilshinsky.  Rather, he considered the signed and executed purchase agreement as his receipt.

21.     Mr. Wilshinsky paid Mr. Porrata $400 in cash on behalf of the Plaintiff LLCs for each Plaintiff LLC's shares of Halberd stock.

22.     The principal consideration exchange for the right to acquire this stock did not flow to Halberd but instead to Mr. Porrata.[6]

---

[5] At the time Mr. Porrata offered shares in Halberd, the Plaintiff LLCs had not yet been formed. The Plaintiff LLCs were specifically created in order to receive the Halberd stock.

[6] Specifically, Mr. Porrata entered into the Purchase Agreements on behalf of Halberd to induce several creditors—*i.e.*, the Plaintiff LLCs, Wilco, and the Wilshinkys—to withdraw or abandon claims totaling $500,000 against Wavelet.  Mr. Porrata sought to purchase Wavelet.  In

23.     The Purchase Agreements closed on June 9, 2011, and Halberd issued 2.7 million shares of its common stock to each Plaintiff LLC (collectively, the "Shares") on that date.

24.     Halberd's Board of Directors originally authorized the issuance of 2.7 million shares of Halberd common stock to each Plaintiff LLC on or about June 9, 2011.  On or about August 18, 2011, Defendant's agent, Mr. Bragg, indicated that everything was in order.  Subsequently, on or about May 22, 2012, Halberd re-issued and delivered the restricted shares of common stock under certificate numbers 1203, 1204, 1205, and 1206 to the Plaintiff LLCs.  (*See* Exs. 5–8.)

25.     On or about October 11, 2012, Halberd represented to Ms. Patterson that the Plaintiff LLCs were affiliate shareholders of Halberd and were not eligible to have the restrictive legends removed from certificates 1203, 1204, 1205, and 1206.

26.     In January 2013, Mr. Wilshinsky contacted ITC and requested that Ms. Patterson release to the Plaintiff LLCs additional stock shares in unlegended form.

27.     Halberd, through attorney Randall Goulding, represented to Ms. Patterson that the Shares, identified by certificate numbers 1203, 1204, 1205, and 1206, were not eligible to have the restrictive legends removed from the stock certificates, because the Shares had not been paid for.

28.     On January 15, 2013, the Plaintiff LLCs obtained a letter from attorney J. Holt Smith ("Attorney Smith"), who opined that: (1) the Plaintiff LLCs were not "affiliates" for purposes of SEC Rule 144; and (2) the Shares were paid for.  As a result, Attorney Smith concluded that the restrictive legends could be removed from the certificate numbers 1203, 1204, 1205, and 1206.  (*See* Exs. 9–12.)

29.     Ms. Patterson received Trial Exhibits 9 through 12.  In an effort to determine whether the Shares were paid for, Ms. Patterson asked Attorney Smith to provide proof of payment, which he never provided.

---

consideration for Halberd agreeing to issue the 10.8 million shares to the Plaintiff LLCs, Wilco and the Wilshinskys did not pursue their claims against Wavelet.  (Ex. 61.)

FINDINGS OF FACT AND CONCLUSIONS OF LAW AFTER COURT TRIAL

30.     Ms. Patterson could not determine when the holding period expired because she never saw proof of payment.  Although Ms. Patterson and ITC were permitted to rely upon the opinion of counsel (typically the issuer's counsel), she chose not to do so.

31.     Ms. Patterson also reviewed the Purchase Agreements, Trial Exhibits 1 through 4, each of which required the payment of $100 at closing.  Exhibit 32 is a letter signed by Mr. Liguori informing Ms. Patterson that Mr. Wilshinsky controlled 13.4 million shares through the Plaintiff LLCs.  Ms. Patterson believed that Mr. Wilshinsky enjoyed a control relationship, meaning that he had a beneficial relationship with the Plaintiff LLCs.[7]

32.     On January 31, 2013, Mr. Katz owned the Plaintiff LLCs, so Ms. Patterson aggregated his interests, totaling 10.8 million shares in Halberd.  This amount was greater than ten percent of the 100,618,824 shares of Halberd stock then issued and outstanding.

33.     Trial Exhibit 10, the letter from Attorney Smith, notes that, as of January 15, 2013, there were 288,291,864 shares of Halberd stock issued and outstanding.  That number of shares is incorrect.

34.     Trial Exhibit 84 lists the correct number of Halberd shares issued and outstanding at that time, namely 100,618, 824.

35.     On February 5, 2013, the Plaintiff LLCs deposited certificate numbers 1203, 1204, 1205, and 1206 into their brokerage accounts at Wilson Davis & Co.

36.     In June 2013, Mr. Liguori informed Mr. Maddox that he (Liguori) no longer operated Halberd.  After Mr. Liguori abandoned his role in Halberd, Mr. Maddox discovered that he was now the sole director of Halberd.  Consequently, Mr. Maddox decided to take control of Halberd.  Mr. Maddox used Trial Exhibit 51, the

---

[7]  Mr. Liguori denies speaking with Ms. Patterson or corresponding with her (electronically or otherwise), attaching resolutions, characterizing relationships, or directing Ms. Patterson to issue stock.

FINDINGS OF FACT AND CONCLUSIONS OF LAW AFTER COURT TRIAL

waiver of notice and action by shareholders and directors by written consent, to gain control of Halberd.[8]  After Mr. Maddox assumed control of Halberd, he did not consult with either Mr. Katz, Mr. Wilshinsky, or the Plaintiff LLCs because Mr. Maddox believed they did not have any operational authority over Halberd.

37.    The Plaintiff LLCs have performed all of the conditions on their part to be performed, and the shares were originally issued on June 9, 2011.  (*See* Dkt. No. 186 ¶ 28.)  Defendant never raised an argument about the validity of the shares until the Shares were deposited with Wilson Davis & Co.

38.    Since February 5, 2013, the Plaintiff LLCs have demanded that Halberd and ITC transfer the Shares.

39.    ITC has never transferred the Shares.

40.    Defendants contacted Attorney Smith to ask him to withdraw his legal opinions.

41.    Defendants later contacted the compliance department of the Plaintiff LLCs' Wilson Davis & Co. broker to attempt to prevent the sale of the Shares.

42.    Halberd's Pink OTC Markets Disclosure Statements acknowledge that the Shares have been issued to the Plaintiff LLCs, without disclosing anything about the Shares' validity.  (Exs. 19–20.)

43.    As a proximate result of the Defendants blocking the transfer of the Plaintiff LLCs' stock since February 5, 2013, the Plaintiff LLCs have been unable to sell the Shares.

44.     From January 2012 to April 2014, Halberd incorrectly reported over 200 million shares of Halberd stock.  Halberd filed a disclosure statement on August 8, 2012 for the period ending April 30, 2012.  (*See* Ex. 29.)  In it, Halberd represented that, effective July 12, 2012, there were 53,047,864 outstanding shares of Halberd common stock.  Conversely, Trial Exhibit 31 reflects a presentation by

---

[8] Mr. Maddox increased the number of shares and issued himself 31,344,000 shares of unrestricted Halberd stock to cancel a $50,000 debt.

FINDINGS OF FACT AND CONCLUSIONS OF LAW AFTER COURT TRIAL

Halberd declaring that, for the period ending January 31, 2013, there were 288,291,864 shares of common stock outstanding, with Mr. Liguori owning 220,084,263 shares.

45.     The outstanding volume of Halberd stock on February 8, 2013 was 100,618,824 shares.  (Ex. 24 at 9.)

46.     The outstanding volume of Halberd stock was increased to 118,634,139 shares on April 26, 2013.  (Ex. 53 at 5.)

47.     The outstanding volume of Halberd stock was increased to 163,989,696 shares by December 31, 2013.

48.     Trial Exhibit 55 states that 118,634,139 shares were outstanding in January 31, 2014.  Trial Exhibit 54 represents that, as of April 30, 2014, there were a total of 123,634,139 million shares outstanding.  Its notes reflect that Precision Aviation purchased controlling stock of Halberd and provided a commercial building and land valued at $1.7 million.  Trial Exhibit 77 likewise represents that, as of June 30, 2014, there were 153,989,698 shares outstanding.

49.     The price of Halberd stock closed at $0.0449 on February 11, 2013; at $0.023 on June 4, 2013; at $0.0099 on August 22, 2013; at $0.0027 on December 20, 2013; and at $0.0038 on March 12, 2014.

50.     As of October 2014, Halberd stock was trading at $0.0075 in 3 million shares volume.

51.     On February 5, 2013, the Plaintiff LLCs' common stock of Halberd had a value of $0.03 per share.  As of March 15, 2013, the value increased to $0.04 per share.  (Exs. 21–22.)

52.     As of July 29, 2013, the value of Halberd common stock was $0.01 per share.  (Exs. 21–22.)

53.     Halberd's stock currently trades for $0.0075 per share.

54.     Mr. Katz formed the opinion that the value of the Halberd stock was $2.65, as reported by the OTC markets.  Beginning on February 5, 2011, the daily

13

volume for Halberd stock was 10 million shares.  In June 2011, Halberd stock was trading at a low of $0.02 and a high of $0.08.  As of October 23, 2014, the value of the Halberd stock was $0.0075.  Mr. Katz has spent $38,000 plus $2300 so far on attorneys' fees and anticipates spending another $15,000.

## VI.   CONCLUSIONS OF LAW

### A.   Federal Securities Fraud

Section 28(a) of the Securities Exchange Act "govern[s] the measure of damages that are permissible under § 10(b)."  *Randall v. Loftsgaarden*, 478 U.S. 647, 663 (1986); *accord DCD Programs, Ltd. v. Leighton*, 90 F.3d 1442, 1446 (9th Cir. 1999) (noting that "[n]either section 10(b) nor Rule 10b–5 sets forth any more specific measure of damages" than section 28(a)).

#### 1.   Out-of-Pocket Damages

Under section 28(a), an "out-of-pocket" measure of damages is generally the correct measure of damages in securities fraud actions premised on a seller's fraud.[9] *Randall*, 478 U.S. at 662.  Out-of-pocket damages are not expectancy damages. *Stone v. Kirk*, 8 F.3d 1079, 1093 (6th Cir. 1993); *see id.* at 1092 ("[E]xpectancy damages – damages designed to give the plaintiff the benefit of his bargain     are simply not recoverable under the federal securities laws.").  "[U]nder the out-of-pocket standard, a defrauded purchaser is entitled to recover the difference between the price he or she paid for a security and the actual value of that security at the time of the purchase, plus interest on the difference."  *DCD Programs*, 90 F.3d at 1447 (citing *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 155 (1972)).

By contrast, a "benefit-of-the-bargain" measure of damages allows a plaintiff to recover "the difference between what the plaintiff *expected* he would receive, had the defendant's representations been true, and the amount [the plaintiff] *actually received*."  *Id.* at 1449 (alteration in original) (quoting *Cunha v. Ward Foods, Inc.*,

---

[9] A rescissory or restitution measure of damages may be applied in appropriate circumstances.  *See DCD Programs*, 90 F.3d at 1449.

804 F.2d 1418, 1426 (9th Cir. 1986)).  The Ninth Circuit "has never held that [benefit-of-the-bargain] damages are permissible under Rule 10b  5 . . . . [and] neither *Affiliated Ute* nor *Randall* suggested that such damages may be recoverable under section 10(b)." *DCD Programs*, 90 F.3d at 1449.  "'[T]he difference between the value of what [the defrauded investor] got and what it was represented he would be getting' is not the measure; out-of-pocket damages are limited to 'the excess of what he paid over the value of what he got.'" *Stone*, 8 F.3d at 1093 (quoting *Levine v. Seilon, Inc.*, 439 F.2d 328, 334 (2d Cir. 1971)).

## 2.    **Other Damages**

In addition to compensatory damages, Rule 10b–5 plaintiffs may recover consequential damages which "can be proven with reasonable certainty *to have resulted from the fraud.*" *Volk v. D.A. Davidson & Co.*, 816 F.2d 1406, 1413 (9th Cir. 1987).  Punitive damages, however, may not be awarded for the violation of federal securities law.  15 U.S.C. § 78bb(a); *Ambassador Hotel Co. v. Wei-Chuan Inv.*, 189 F.3d 1017, 1031 (9th Cir. 1999) ("Punitive damages may not be awarded for the violation of federal securities law.").

In this case, the Court finds that each Plaintiff LLC paid $100 in cash for the Shares.  The Court does not find that the $500,000 forgiveness of debt constitutes appropriate damages for securities fraud for two reasons.  First, the purportedly forgiven $500,000 debt did not benefit Halberd, but rather solely Mr. Porrata.  Second, Trial Exhibits 1 through 4 list the purchase price of the Shares as solely $100.  (Ex. 1 ¶¶ 1, 2.2.)  The Purchase Agreements make no mention of the $500,000 debt.  Trial Exhibits 1 through 4 also affirm that each agreement constitutes the "full and entire understanding and agreement among the parties." (*See, e.g.*, Ex. 1 ¶ 6.3.)  Accordingly, the Court awards damages in the amount of $400, $100 to each Plaintiff LLC for this claim.  The Court declines to award additional damages, finding that the Plaintiff LLCs have failed to establish additional damages to a reasonable certainty resulting from the fraud.

## B.   <u>Breach of Contract</u>

Although the Plaintiff LLCs' fifth cause of action asserts a claim for "injunctive relief," the substance of the allegations concerns a purported breach of contract.  And in construing the Plaintiff LLCs' claims, the Court is to "focus on the substance of the plaintiffs' claims, not the plaintiffs' labels." *Sateriale v. R.J. Reynolds Tobacco Co.*, 697 F.3d 777, 782 (9th Cir. 2012); *accord Sholiay v. Fed. Nat'l Mortg. Ass'n*, No. CIV 2:13-00958, 2013 WL 5569988, at *3 (E.D. Cal. Oct. 9, 2013) ("The court is focused on the substance of the plaintiff's claims, not the plaintiff's labels, and will therefore construe plaintiff's wrongful foreclosure claim as a breach of contract claim." (internal quotation marks and modifications omitted)); *see also Madrid v. Concho Elementary Sch. Dist. No. 6 of Apache Cnty.*, 439 F. App'x 566, 567 (9th Cir. 2011) ("The district court did not abuse its discretion in deciding to construe Madrid's claim for injunctive and declaratory relief as part of his breach of contract claim.").  Accordingly, the Court construes the Plaintiff LLCs' fifth cause of action as a claim for breach of contract.

"It is well settled that parties are permitted to select the law that will govern the validity and effect of their contract." *Engel v. Ernst*, 724 P.2d 215, 216–17 (Nev. 1986).  Both sides agree and Trial Exhibits 1 through 4 provide that Nevada law shall govern this dispute.  (*See, e.g.*, Exs. 1–4.)

### 1.   <u>Specific Performance</u>

Specific Performance is an equitable remedy, not a cause of action.  *Serpa v. Darling*, 810 P.2d 778, 782 (Nev. 1991).  In Nevada, it has long been established that shares of corporate stock are not recoverable in an action for specific performance of a contract unless the plaintiff has no adequate remedy at law.  *Nielsen v. Rebard*, 183 P. 984, 985 (Nev. 1919) ("[I]t is a well-established rule in this jurisdiction that shares of stock cannot be recovered in an action for specific performance unless they possess peculiar and unusual value."); *cf. Sundstrand Corp. v. Standard Kollsman Indus., Inc.*, 488 F.2d 807, 814 (7th Cir. 1973) ("At least in cases involving stock

contracts, specific performance is an exceptional remedy."). This general rule "applies [] particularly to public stocks such as are commonly bought and sold in the market." *Turley v. Thomas*, 101 P. 568, 574 (Nev. 1909); *accord id.* at 575 (stating that a contract for the sale of corporate stock will not be specifically enforced "where the stock can be purchased on the market and its value can be readily ascertained"). Yet if the shares "possess peculiar and unusual value," *Nielsen*, 183 P. at 985, they are "limited and not easily obtainable," or "their value cannot be readily ascertained," a recovery of damages at law may be inadequate. *Turley*, 101 P. at 575.

In circumstances where a plaintiff has no adequate remedy at law, "[s]pecific performance is available when the terms of the contract are definite and certain, the remedy at law is inadequate, the plaintiff has tendered performance, and the court is willing to order it." *Carcione v. Clark*, 618 P.2d 346, 348 (Nev. 1980) (internal citations omitted) (applying Nevada law). Furthermore, "a court of equity may award monetary compensation as incidental relief where specific performance does not by itself afford complete relief." *Stoltz v. Grimm*, 689 P.2d 927, 930 (Nev. 1984).

### 2. <u>Contract Damages</u>

It is well settled that in contracts cases, compensatory damages "are awarded to make the aggrieved party whole and . . . should place the plaintiff in the position he would have been in had the contract not been breached." *Road & Highway Builders v. N. Nev. Rebar*, 284 P.3d 377, 382 (Nev. 2012) (alteration in original). "[D]amages need not be proven with mathematical exactitude, and . . . the mere fact that some uncertainty exists as to the actual amount of damages sustained will not preclude recovery." *Frantz v. Johnson*, 999 P.2d 351, 360 (Nev. 2000). The party seeking damages has the burden of proving both the fact of damages and the amount thereof. *Mort Wallin of Lake Tahoe, Inc. v. Commercial Cabinet Co., Inc.*, 784 P.2d 954, 955 (Nev. 1989).

### (a)  <u>Restricted Securities</u>

Restricted securities are securities acquired in unregistered, private sales from an issuing company or from an affiliate of the issuer.  *See* 17 C.F.R. § 230.144(a)(3)(i).  Section 5(a) of the Securities Act provides that "[u]nless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly . . . to sell such security."  15 U.S.C. § 77e(a).  Registration statements provide information about the issuer's financial condition, the identity and background of management, and the price and amount of securities to be offered. *See* 15 U.S.C. §§ 77g, 77aa.  Given that the purpose of the Securities Act is "to protect investors by promoting full disclosure of information thought necessary to informed investment decisions," *SEC v. Ralston Purina Co.*, 346 U.S. 119, 124 (1953), section 5's restrictions target persons who presumably have superior access to material information about the company, *see S.E.C. v. Cavanagh*, 1 F. Supp. 2d 337, 366 (S.D.N.Y. 1998).  Section 2(a)(4) defines an "issuer" as any "person who issues or proposes to issue any security."  15 U.S.C. § 77b(a)(4).  The "issuer" is generally the company that issues a security.  *Cavanagh*, 1 F. Supp. 2d at 362. Section 2(a)(11) defines the term "underwriter" as "any person who has purchased from an issuer with a view to . . . the distribution of any security."  15 U.S.C. § 77b(a)(11).

### (b)  Conditions of Sale for Restricted Securities

Despite section 5's restrictions, Rule 144(k) grants exemptions to permit public sales of restricted securities where certain conditions are met.  As an initial matter, all restricted securities must be held for at least one year prior to any public sale.  17 C.F.R. § 230.144(d)(1)(ii); *Portside Growth & Opportunity Fund v. Gigabeam Corp., Inc.*, 557 F. Supp. 2d 427, 432 (S.D.N.Y. 2008).  Once a seller has held the stock for one year, the conditions under which a public sale may be permissible are premised on whether or not the seller is an "affiliate" of the company issuing the securities.  17 C.F.R. § 230.144(e).

SEC Rule 144 imposes a waiting period on stock transfers.  The stockholder must keep the shares for six months for a fully reporting company, or one year for a company that is not fully reporting.  The period begins upon proof of payment.

In addition, Rule 144 prohibits a stockholder from being an affiliate of the company.  Generally, an affiliate is either an officer or director of the company or someone who owns 10% of the issued and outstanding shares of stock.  More specifically, an "affiliate" is "a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such issuer." *Id.* § 230.144(a)(1).  The term "control"—including the terms controlling, controlled by, and under common control with—"means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." *Id.* § 230.405.  Control is "a question of fact which depends upon the totality of the circumstances including an appraisal of the influence upon management and policies of a corporation by the person involved." *S.E.C. v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1087 (9th Cir. 2010) (quoting *United States v. Corr*, 543 F.2d 1042, 1050 (2d Cir. 1976)).  The SEC, however, has generally asked whether the particular person is "in a position to obtain the required signatures of the issuer and its officers and directors on a registration statement." *Cavanagh*, 1 F. Supp. 2d at 362.

"Although there is no bright-line rule declaring how much stock ownership constitutes 'control' and makes one an 'affiliate' under [Rule 144], some commentators have suggested that ownership of something between ten and twenty percent is enough, especially if other factors suggest actual control." *S.E.C. v. Cavanagh*, 445 F.3d 105, 113 n.19 (2d Cir. 2006) (citing Sidney Ravkind, *We New Wizards of Wall Street*, 66 Tex. B.J. 120, 126 n.32 (2003)).  In *Cavanagh*, the Second Circuit concluded that two partners who each owned "nearly one-quarter" of a small business constituted affiliates by ownership because they were "controlling

shareholders." *Id.* at 114.  Other courts have observed that "it seems likely that the inquiry about control or of control by a 'small business' will be set [by the SEC in a new rule] in the 25 percent range.  After all, ownership of 10 percent of General Motors with its gillion shareholders is different than owning 10 percent of a much smaller entity." *Trustcash Holdings, Inc. v. Moss*, 668 F. Supp. 2d 650, 660 (D.N.J. 2009) (modification in original) (quoting Ravkind, *supra*, at 126); *cf. S.E.C. v. M & A W., Inc.*, 538 F.3d 1043, 1051 (9th Cir. 2008) ("These individuals represented in their respective reorganization agreements that they controlled no less than 75% of the shares of the shell companies.  The authority to transfer ownership of the company, coupled with their significant ownership stake, is more than sufficient to establish affiliate status.").

A seller who is "not an affiliate" may sell his or her restricted securities after holding the stock for one year subject to one requirement: the seller must arrange for the "restrictive legend" on the certificate to be removed.[10] *Guilfoyle v. Olde Monmouth Stock Transfer*, No. 60478, 2014 WL 4946841, at *2, 7 (Nev. 2014) (quoting U.S. Sec. & Exch. Comm'n, *Rule 144: Selling Restricted and Control Securities*, https://www.sec.gov/investor/pubs/rule144.htm (last visited Oct. 21, 2014)) [hereinafter SEC, *Rule 144*].  "Only a transfer agent can remove a restrictive legend . . . . [b]ut the transfer agent won't remove the legend unless you've obtained the consent of the issuer—usually in the form of an opinion letter from the issuer's counsel—that the restrictive legend can be removed." *Id.* at *7.

On the other hand, an "affiliate" of the issuing company may only sell restricted securities if two primary requirements are met.[11]  First, a notice of sale must be filed with the SEC for transactions involving (1) 5000 or more restricted

---

[10] A "restrictive legend" is a statement placed on the certificate of a restricted stock used to notify the holder of the stock that it may not be resold without registration.  *Geiger v. SEC*, 363 F.3d 481, 483 (D.C. Cir. 2004).

[11] In addition to the requirements discussed above, 17 C.F.R. § 230.144(f) requires that sales be handled "as routine trading transactions" and that neither the seller nor the broker may solicit orders to buy the securities.  *Portside Growth*, 557 F. Supp. 2d at 433.

shares within a three-month period, or (2) more than $50,000 in proceeds within a three-month period.  *See* 17 C.F.R. § 230.144(h).  Second, the affiliate may not sell during any three-month period more than the greater of: (1) one percent of the issuer's outstanding shares of the same class, or (2) the average weekly trading volume for issuer stock during the four-week period preceding the sale.  17 C.F.R. § 230.144(e)(1); *see also SEC v. M&A W., Inc.*, 538 F.3d 1043, 1050–51 & n.7 (9th Cir. 2008).  Over-the-counter stocks, including those quoted on the OTC Bulletin Board and the Pink Sheets, can only be sold by an affiliate using the one-percent volume limitation.  SEC, *Rule 144*, *supra*.

The OTC market is a nationwide network of securities brokers and dealers who buy and sell securities which, "for the most part, are not listed on a securities exchange."  Securities; NRS 78.521, 1989 Nev. Op. Atty. Gen. 66, 1989 WL 436647, at *1 (1989).  The term "Pink Sheets" refers to a financial service that reports information about over-the-counter securities trading and issuers.  *Kaplan v. First Hartford Corp.*, 603 F. Supp. 2d 195, 197 n.3 (D. Me. 2009).  The domestic companies listed on the Pink Sheets tend to be closely held, extremely small, and/or thinly traded.  *Id.*  And in some circumstances, thinly traded stocks can reflect a lack of marketability.  *See id.* at 204 ("That lack of marketability is reflected in the thinness of trading . . . .").  As a result, a company's history of Pink Sheet trading may be used to estimate or discount the market value of OTC securities.  *Id.* at 203 (noting that a valuation expert reduced market value by assigning an eighty-percent weight to the Pink Sheet prices).

### (c)    Discounting for Restricted Marketability

The right to transfer property is "one of the most essential sticks in the bundle of rights that are commonly characterized as property."  *Shackleford v. United States*, 262 F.3d 1028, 1032 (9th Cir. 2001).  "It is axiomatic that if an asset's marketability is restricted, it is less valuable than an identical marketable asset."  *Shackleford*, 262 F.3d at 1032 (citing *Mailloux v. Commissioner*, 320 F.2d 60, 62 (5th Cir. 1963)).

The Ninth Circuit has long recognized that restrictions on alienability reduce value. *Id.* (citing *Bayley v. Commissioner*, 624 F.2d 884, 885 (9th Cir. 1980) (holding that stock transfer restrictions affect valuation)). "[I]f stock is subject to resale restrictions under the federal securities laws which prevent it from being sold freely in the public market, a discount from the mean may be necessary to measure the stock's value accurately." *Trust Servs. of Am. Inc. v. United States*, 885 F.2d 561, 569 (9th Cir. 1989) (citation omitted).

In this case, the Court finds that the Plaintiff LLCs have an adequate remedy at law. The contract damages for any breach of contract provide adequate damages. As the above authorities instruct, specific performance is an exceptional remedy. The Plaintiff LLCs have failed to show that the Shares "possess peculiar and unusual value." *See Nielsen*, 183 P. at 985. Accordingly, the Court declines to require the transfer of the Shares.

That leaves the Plaintiff LLCs with contract damages. The Court construes the Plaintiff LLCs' fifth cause of action to be a breach of contract action. Trial Exhibits 1 through 4 required Halberd to transfer 2,700,000 restricted shares to each Plaintiff. Based upon their Answer, Defendants admitted that the Plaintiff LLCs fully performed under the Purchase Agreements. Consequently, Halberd remains responsible for contract damages, subject to the Plaintiff LLCs' proof. Mr. Katz admitted that he completed a regression analysis but did not produce this document to Defendant. Accordingly, the Court did not hear testimony or consider this evidence. *See* Fed. R. Civ. P. 37. Mr. Katz urged the Court to calculate damages by awarding the Plaintiff LLCs the diminution in value of the Shares between the date of the signing of the Purchase Agreement and the current date. Yet the Plaintiff LLCs' calculation ignores the application of SEC Rule 144.

In assessing contract damages under the Purchase Agreements, the Court finds that the amount of damages depends upon whether the Court finds the Plaintiff LLCs to be affiliates. In this case, Mr. Wilshinsky testified, in essence, that the Plaintiff

LLCs had an unwritten side agreement with Mr. Porrata, who was purporting to act on behalf of Halberd.  The Plaintiff LLCs agreed to pay a mere $100 in cash for millions of shares of stock having a trading value of hundreds of thousands of dollars.  The Purchase Agreements themselves affirm that they constitute the entire understanding between the parties.  They further warrant that the purchasers are sophisticated.  Assuming for the truth of Mr. Wilshinsky's testimony that unwritten consideration existed, it inured to the benefit of Mr. Porrata, not Halberd.  The parties do not dispute that Mr. Porrata received a profit of $200,000 as a result of the Purchase Agreements.  These facts compel the Court to conclude that the Plaintiff LLCs exercised indirect control and were affiliates.  As a result, Rule 144 would apply and subject the Plaintiff LLCs to its stock sales restrictions.  Consistent with Rule 144, the Plaintiff LLCs could not immediately sell all of their shares of Halberd stock.  Rather, the first date on which the Plaintiff LLCs could sell their shares would be February 8, 2013.  In addition, the Plaintiff LLCs could sell only 1,006,166 shares.  At that time the average price for Halberd stock was $0.0329, resulting in total proceeds of $33,102.86.[12]  On May 8, 2013, the Plaintiff LLCs could sell an additional 1,186,341 shares.  The average price during this time was $0.0187, resulting in proceeds of $22,184.58.[13]  Finally, after August 8, 2013,[14] the Plaintiff LLCs could sell the remainder of its shares consistent with Rule 144.  The remaining 8,607,493 shares could then be sold.  The average price during this timeframe was $0.0040, resulting in proceeds of $34,429.97.[15]  This results in total contract damages in the amount of $89,717.41.

---

[12] Halberd concedes that the best date to sell its stock during this timeframe was February 22, 2013.

[13] Again, Halberd admits that the best timeframe to sell its stock was between June 11, 2013 and June 24, 2013.

[14] August 8, 2013 represents the date when Plaintiffs' indirect control over Halberd ceased and when their stock fell below a ten percent threshold.

[15] Halberd notes that the most favorable timeframe to sell its shares was between August 8, 2013 and July 9, 2014.

FINDINGS OF FACT AND CONCLUSIONS OF LAW AFTER COURT TRIAL

### C.      Adjustment of Remedies

At the outset, the Court recognizes that Plaintiff may seek both damages for Defendants' Rule 10b–5 violations and specific performance for its breach of contract claim.  *See Omega Exec. Servs. v. Grant*, No. 78 Civ. 4616, 1980 WL 1432, at *2 (S.D.N.Y. Aug. 22, 1980) ("[T]he availability of a damages remedy under the federal securities acts does not preclude an award of specific performance under state law." (citing *Ryan v. Foster & Marshall, Inc.*, 556 F.2d 460, 464 (9th Cir. 1977))). Because Plaintiff is not seeking rescission of its contract, it would not be inherently inconsistent for Plaintiff to seek both specific performance on a breached contract and damages incurred as a result of Defendants' securities violations.  *See Medcom Holding Co. v. Baxter Travenol Labs., Inc.*, 984 F.2d 223, 228–30 (7th Cir. 1993) (discussing this distinction); *cf. E. H. Boly & Son, Inc. v. Schneider*, 525 F.2d 20, 24 (9th Cir. 1975) ("When one party repudiates a contract or commits a total breach thereof, the injured party has an election to pursue one of three remedies; he may treat the contract as at an end and sue for restitution, he may sue for damages, or he may sue for specific performance in certain cases.").

Nevertheless, it is a long-settled principle that "the injured party cannot at the same time receive a decree for specific performance and a judgment for damages based on a total breach."  *Riess v. Murchison*, 503 F.2d 999, 1008 (9th Cir. 1974). Thus, in cases such as this one where an award of specific performance would eliminate the injury that is the basis of the plaintiff's damages, a concurrent award of damages would result in a double recovery to the plaintiff.  *See Medcom*, 984 F.2d at 230.  Accordingly, while Plaintiff may properly seek both damages and specific performance, the Court will adjust any award of remedies to prevent double recovery.  *See Omega Exec. Servs.*, 1980 WL 1432, at *2 ("[A]ny overlap of the remedies available to Omega on its federal and state causes of action can be adjusted by the court to prevent duplicative recovery.").  Because the Court has declined to

require specific performance, the above award of contract damages does not result in a double recovery.

### D.   Tortious Interference with Economic Advantage

Under Nevada law, a plaintiff may seek recovery for tortious interference with prospective economic advantage.  *See Sunridge Builders, Inc. v. Old Blue, LLC*, No. 56335, 2013 WL 485831, at *2 (Nev. Feb. 6, 2013) ("One to whom another has tortiously caused harm is entitled to  compensatory damages for the harm if . . . he establishes by proof the extent of the harm and the amount of money representing adequate compensation." (quoting Restatement (Second) of Torts § 912 (1979)). Such recovery may include compensatory damages, *id.*, and, in cases in which the plaintiff has demonstrated through clear and convincing evidence "oppression, fraud or malice, express or implied," punitive damages as well.  *Peri & Sons Farms, Inc. v. Jain Irrigation, Inc.*, 933 F. Supp. 2d 1279, 1294 (D. Nev. 2013) (quoting Nev. Rev. Stat. § 42.005(1)).

As the Court observed in its order regarding Defendant's Motion in Limine No. 5, however, "Nevada law confirms an employee acting within the scope of their employment (principal's interest) cannot constitute an intervening third party and so cannot tortiously interfere with a contract to which the principal is party." *Laguna v. Am. Family Mut. Ins. Co.*, 3:10-CV-00108-RCJ, 2010 WL 3119282, at *3 (D. Nev. Aug. 3, 2010); *accord Alam v. Reno Hilton Corp.*, 819 F. Supp. 905, 911 (D. Nev. 1993) ("[T]he defendants named in this claim (managers Giorgilas and Andrews) do not constitute intervening third parties as they are agents acting in the scope of their principal's (the Reno Hilton) interest."); *see also Haigh v. Matsushita Elec. Corp. of Am.*, 676 F. Supp. 1332, 1349 (E.D. Va. 1987) ("The interferor cannot be a party to the contract or business relationship, but must occupy the position of a third party." (citing Restatement (Second) of Torts § 766 (1979))).  Accordingly, Defendants Mr. Liguori and Mr. Lowing could only be liable for intentional interference if the Court found them to be acting outside the scope of their employment.  The Court has not

FINDINGS OF FACT AND CONCLUSIONS OF LAW AFTER COURT TRIAL

made a finding of fact on this basis.  As a result, Nevada law precludes Mr. Liguori and Mr. Lowing from being liable for tortious interference with economic advantage.

### E.    <u>Breach of Contract Based upon Third-Party Beneficiary Status</u>

A non-party to a contract can enforce the contract only if the contract reflects a clear promissory intent to benefit the third party.  *Kremen v. Cohen*, 337 F.3d 1024, 1029 (9th Cir. 2003). "The intended beneficiary need not be specifically or individually identified in the contract, but must fall within a class clearly intended by the parties to benefit from the contract." *Id.* (quotation omitted).  A promissory intent to benefit the third party must be clearly present, and the third party beneficiary's reliance thereon must be foreseeable.  *Williams v. Univ. Med. Ctr. of S. Nev.*, 688 F. Supp. 2d 1134, 1144 (D. Nev. 2010) (citing *Lipshie v. Tracy Inv. Co.*, 566 P.2d 819, 824–25 (Nev. 1977)).

Here, ITC's conduct was reasonable.  Faced with questions as to whether the Plaintiff LLCs paid for the stock, and, if so, the date upon which they made payment, ITC reasonably refused to remove the restrictions on the Shares.  Attorney Smith's letters did not require ITC to remove the restrictions for the following reasons.  First, the Plaintiff LLCs, not Halberd, obtained those opinions.  Second, Attorney Goulding provided a contrary opinion.  In light of two conflicting attorney opinions, ITC reasonably refused to remove the stock restrictions.  Accordingly, the Court finds for Defendant ITC.

## VII.   <u>JUDGMENT</u>

1.   <u>Securities Fraud:</u>  The Court finds in favor of Plaintiffs in the amount of $400;

2.   <u>Breach of Contract under a Third-Party Beneficiary:</u>   The Court finds in favor of Defendant ITC;

3.   <u>Breach of Contract:</u>  The Court finds in favor of Plaintiffs in the amount of $89,717.41;

4.   <u>Interference with Prospective Economic Advantage:</u>  The Court finds in favor of Defendants Liguori and Lowing.

**IT IS SO ORDERED.**

Dated:  March 30, 2015

_____
HONORABLE BEVERLY REID O'CONNELL
UNITED STATES DISTRICT COURT JUDGE